RECEIVED
Mailroom

JUL 14 2025

Angela D. Caesar, Clerk of Clerk
U.S. District Court, District of Columbia

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

**Case: 1:25-cv-02332    JURY DEMAND**
**Assigned To : Chutkan, Tanya S.**
**Assign. Date : 7/14/2025**
**Description: Pro Se Gen. Civ. (F–DECK)**



JULIAN RAVEN,
ARTIST & AUTHOR,
CITIZEN BENEFICIARY,
& DEFENDER
OF THE
SMITHSON TRUST

V

JOHN G. ROBERTS, JR.,
IN HIS OFFICIAL CAPACITY
AS CANCELLOR OF THE
SMITHSONIAN INSTITUTION

LONNIE BUNCH III,
SECRETARY OF THE
SMITHSONIAN INSTITUTION

DR. RICHARD KURIN
FORMER SMITHSONIAN
UNDER SECRETARY

SMITHSONIAN
BOARD OF REGENTS,
DEFENDANTS

**FOR BREACHES OF FIDUCIARY DUTY, CONSTRUCTIVE FRAUD, AND INSTITUTIONAL NONFEASANCE IN VIOLATION OF SMITHSON TRUST**

## PRELIMINARY STATEMENT AND BACKGROUND

1. This Complaint arises from a long-standing and systemic pattern of fiduciary breach, institutional negligence, and constitutional disregard by trustees charged with preserving the legacy, purpose, and public benefit of the Smithson Trust. Plaintiff Julian Raven, an American citizen and lawful trust beneficiary, brings this action to restore the legal sanctity of the Smithson

trust and vindicate his rights under federal and trust law.

2. Established by the Act of Congress in 1846, the Smithsonian Institution exists as a trust instrumentality of the United States, endowed by British scientist James Smithson for the "increase and diffusion of knowledge." Its Board of Regents—a body including the Chief Justice of the United States, the Vice President, members of Congress, and congressional appointees—serve not as government officials or figureheads, but as citizen fiduciary delegates owing the highest duties of care and loyalty to the private citizen, "enlightened donor" and testator James Smithson and to the 'Cestui que trust' or beneficiaries, the American people.

3. This case demonstrates the collapse of that duty. The history of institutional negligence is well-documented. In 1976, Pulitzer Prize–winning journalist Clark Mollenhoff exposed deep-rooted corruption in the Board of Regents. In his editorial, "Something Smells at Smithsonian" (The Des Moines Register), he wrote:

"The Smithsonian has been set up as a harboring place for free-wheeling financial policies with no effective internal, financial policing mechanisms... the top... condone a board of regents that is nothing more than an honorific panel."

4. Mollenhoff warned that the Regents enabled conflicts of interest and private profiteering, operating under the guise of public service.

5. In 2007, a follow-up Independent Review Committee (IRC) led by Charles Bowsher again confirmed:

"The Smithsonian's governance system was broken. There was insufficient accountability, transparency, and oversight."

6. These damning findings spurred a series of ethical reforms led by then-new Chancellor Chief Justice John Roberts. Yet those very reforms were later disregarded under his own tenure, as seen in Plaintiff's experience.

7. Plaintiff Julian Raven submitted his portrait of then-Presidential candidate - President Elect Donald J. Trump in 2016 to the Smithsonian National Portrait Gallery. Director Kim Sajet personally rejected the work with hostility, political animus and overt partisanship, delivering an 11-minute phone call punctuated by the assertion:

"I am the Director of the Smithsonian! Your application will go no further, you can appeal it all you want!"

8. Plaintiff's direct appeals to Chief Justice Roberts—as Chancellor and fiduciary—and to each member of the Board of Regents individually as fiduciary delegates, was met with a deflection of their duty, handing over the appeal to a Smithsonian employee, Dr. Richard Kurin. Kurin concurred with Kim Sajet, refused to adjudicate plaintiff's bruised beneficiary status and slammed the Smithsonian door, ignoring all further correspondence. Chancellor Roberts as

Chief Justice subsequent recusal from Plaintiff's Supreme Court petition for cert in 2019 further confirms his knowledge and deliberate continued inaction as the nations' senior officer of justice.

8. In 2018, federal Judge Trevor McFadden described Sajet's conduct as "odious and partisan," setting a judicial marker. Despite this, the Smithsonian Institution, its leadership, and the Board of Regents ignored the ruling, welcoming Kim Sajet back to work causing further injury, ridicule and hostility to the plaintiff while continuing to trample the rights of a Smithson trust beneficiary.

10. In May 2025, President Donald Trump publicly demanded Sajet's removal, labeling her "highly partisan and unfit." The Washington Post reported that Julian Raven's case against Kim Sajet due to her odious and partisan rejection of his presidential painting 'Unafraid and Unashamed,' was #4 on the president's list of 17 reasons to fire Kim Sajet. Two weeks later, Sajet resigned. This resignation is incontrovertible confirmation of the institutional failures described herein. If Sajet was innocent of the partisan charge, she could have remained on the job, fought for her rights of unlawful dismissal under the vast body of wrongful dismissal laws including claiming retaliation and job discrimination. But the president's actions finally put the spotlight on her partisan actions. If push came to shove, and Sajet claimed retaliation or discrimination any litigation would have highlighted the treasure trove of evidence vindicating the president's accusation that Sajet was a partisan actor. There is evidence going back eight years, establishing sufficient grounds for her termination 8 years ago.

11. Compounding these breaches, Secretary Lonnie Bunch admitted in recent public statements

that the Smithsonian had permitted political partisanship to permeate curatorial and administrative decisions. But no mention by Secretary Bunch of where, or by who and to whom. Thus no consciousness of fiduciary duties owed to the American people, the Smithson trust beneficiaries or any victims of this admitted partisanship.

12. The result is a pattern of fiduciary defiance. The Board of Regents—as trustee-delegates of Congress—has empowered violations, ignored judicial rulings, silenced beneficiaries, and eroded the public's trust. Even Senator Chuck Grassley, in a letter to Roberts, condemned the Institution's leadership for running a "private fiefdom with public funds" and cultivating "a culture of secrecy."

13. Despite widespread criticism, Secretary **Lonnie G. Bunch III** publicly affirmed the Smithsonian's commitment to political neutrality. Following President Trump's May 2025 directive, Bunch issued a statement reading:

"The Smithsonian… understands and appreciates our mission… our work will be shaped by the best scholarship, free of partisanship"

14. Bunch's assertion of nonpartisanship is demonstrably false, as the Institution knowingly retained **Kim Sajet**, whose conduct was both partisan and overtly political. Evidence includes:

● Sajet publicly marching in the **anti-Trump Women's March on January 21, 2017**—one day post-inauguration—posting smiling selfies to the **National Portrait Gallery Director's official Twitter page**

● These selfies and her participation in the rally featured prominently in Plaintiff's 2017-18 litigation, yet no internal corrective action was taken.

15. Moreover, during the litigation, evidence emerged that Sajet and the Smithsonian deliberately **converted the official Twitter handle @NPGDirector to a personal handle @KimSajet,** effectively obscuring institutional endorsement of partisan activity. Despite the name change, the account continued posting official Smithsonian content—demonstrating calculated attempts to **shield her partisan conduct** while preserving professional authority.

16. In 2022, Plaintiff Julian Raven filed suit (22-cv-2809 CRC) after being unlawfully blocked by Kim Sajet from the very Twitter account she and the Smithsonian had previously converted from an official Smithsonian account (@NPGDirector) into a personal one (@KimSajet) during ongoing litigation. This act of digital obfuscation was a strategic move to shield her from accountability while continuing to use the account for official business. Despite the account's long history of Smithsonian-related content—including press releases, institutional updates, curatorial announcements, and reposts of official government functions—Sajet asserted it was a "private" space for personal expression. When Raven was blocked, it served not merely as retaliation but as a renewed weapon to exclude him from participating in the very trust from which he had already been wrongfully barred. In a deeply flawed ruling, Judge Christopher R. Cooper sided with Sajet, dismissing the extensive evidence of the account's public character and disregarding Plaintiff's request to consider *Lindke v. Freed*, a controlling precedent on the use of official social media by public officials. By accepting Sajet's bare assertions and ignoring the public record of hundreds of job-related tweets, the Court legitimized a digital tool of censorship and deepened the violation of Raven's rights as citizen beneficiary of the Smithson Trust.

**CAUSES OF ACTION**

**COUNT 1: BREACH OF FIDUCIARY DUTY**

Defendants, in their roles as fiduciaries of the Smithson Trust, failed their core duties of care, loyalty, and impartiality. Specifically, they retained and shielded Director Kim Sajet after she was judicially described as "odious and partisan" by Judge Trevor McFadden in 2018. Rather than remove Sajet, or at a minimum order the reconsideration of plaintiff's work according to established standards of portraiture consideration, the Regents ignored formal appeals, including Plaintiff's direct petition to Chief Justice Roberts, the Chancellor of the Institution. This breach was compounded by the public participation of Sajet in an anti-Trump political rally on January 21, 2017, and the use of official Smithsonian social media (@NPGDirector) to publish partisan imagery. Further compounding the breach, Sajet personally blocked Plaintiff on Twitter from accessing official National Portrait Gallery communications—an act of censorship against a trust beneficiary.

The Smithsonian Board of Regents failed to act when Sajet again rejected the Trump portrait during the lead-up to the 2025 presidential inauguration, which within 5 months the President of the United States publicly labeled her "highly partisan" and demanded her removal. The Secretary and the Regents' refusal to act in concert with the President—who echoed earlier judicial findings—demonstrates a long-standing institutional resistance to correction, accountability, and fiduciary compliance.

Plaintiff's original appeal to the Board of Regents, in December 2016 was never adjudicated. Instead, it was deflected to Dr. Richard Kurin, who concurred with Sajet's actions and provided institutional cover for her partisan decision-making. In doing so, the Defendants collectively violated the will of James

Smithson by refusing to fulfill their duty to promote the "increase and diffusion of knowledge." Kurin's actions as a trustee delegate not only condemn his own actions but those responsible of delegating the responsibility to him which he flagrantly breached. Kurin claimed they had already selected a portrait, in his attempt to validate Sajet's rejection, but again violated the will of Smithson by using an existing portrait from their vault.

There was nothing new, no increase of knowledge and no interest from the public to go and see an old photo from 20 years ago. Who would go and see that? No one, and no one went. It was a deliberate effort to keep inauguration celebrants away since who would go see just another photo of Trump... but an original, hand painted 7x16 presidential portrait layered in patriotic American symbolism was deemed "too big, not from life, too pro trump, too political, not neutral enough and no good' relating to the political campaign of 2015/2016 but a photo of Trump when he was a real estate developer. Just compare that with the pomp and circumstance around any portrait of the Obamas promoted and displayed at the Smithsonian and one can taste the partisanship.

Their continued employment and defense of Sajet contradicted their own Smithsonian Standards of Conduct and institutional policies for artifact evaluation. According to these standards, every submission must be considered based on its contribution to America's historical record and its potential to fill identified gaps in the museum's collection. Plaintiff's portrait met these standards. Yet the rejection was carried out with arbitrary and capricious reasoning, without a fair, documented, and impartial review—further proof that the fiduciaries breached their:

1.      Duty to Administer trust

2.      Duty of loyalty - "(a) A trustee shall administer the trust solely in the interests of the beneficiaries."

3.      Duty of impartiality -

4.      Duty to inform and report

5.      Duty of prudent administration

These coordinated failures rise to the level of a systemic betrayal of public trust and justify the removal of these Defendants from all fiduciary roles within the Smithsonian Institution.

## COUNT II: CONSTRUCTIVE FRAUD AND MISREPRESENTATION

The Smithsonian Institution and its agents made repeated public declarations—such as those by Secretary Lonnie Bunch in 2025—asserting their commitment to political neutrality and nonpartisanship. These statements were false, or recklessly indifferent to the truth, given the prior judicial finding that Sajet was partisan, her anti-Trump participation, and the internal attempts to rebrand official social media accounts (from @NPGDirector to @KimSajet) during litigation. These actions constitute constructive fraud by misrepresenting the institution's integrity to the public, funders, and beneficiaries, thereby harming Plaintiff's trust-based reliance and institutional access.

## COUNT III: INSTITUTIONAL NONFEASANCE AND TRUSTEE DERELICTION

Chief Justice Roberts, as Chancellor, and the Board of Regents, willfully abdicated their duties as trustee delegates by failing to investigate or act upon credible allegations of misconduct from Plaintiff, a lawful beneficiary. Not only did Roberts recuse himself from related litigation—implicitly acknowledging his knowledge of the case—but he and the Board also permitted Sajet to remain in her role for eight years despite ongoing misconduct and legal challenges. Their inaction violated their duty to enforce the donor's mandate for the "increase and diffusion of knowledge" and instead resulted in partisan censorship, public distrust, and reputational harm to the Institution. The fiduciaries' silence in the face of judicial condemnation and public protest undermines their legal, moral, and administrative authority.

Furthermore, all Defendants, individually and corporately, violated the fundamental will of James Smithson by resisting the very increase and diffusion of knowledge they were entrusted to promote. Their collective efforts to suppress, reject, and obstruct the inclusion of Plaintiff's artwork—depicting the historic 2015–2016 presidential campaign and its broader cultural implications—constitute a breach of the original trust purpose. This violation is further compounded by their refusal to reconsider the portrait's significance for the 2025 inauguration, even after the subject of the portrait, Donald J. Trump, was reelected as the come-back- President, a remarkable historic American event. These failures demonstrate their opposition to the dissemination of a historically relevant narrative that includes the Institution's own misconduct. Thus, their conduct fulfills the judicial characterization of being both "odious and partisan," confirming their unfitness to continue serving as trustees of the Smithson Trust.

Additionally, the Regents' and Defendants' endorsement, protection, and promotion of Sajet's egregious conduct directly contravened their own codes of ethics and internal curatorial standards for artifact review. The Plaintiff's artwork clearly met the established criteria of documenting a specific gap in the American historical and pictorial record, yet it was rejected arbitrarily and without the application of those objective standards. In backing Sajet's personal animus and ideological bias, the Defendants substituted codified institutional discretion with partisan prejudice. As a result, they breached their oaths, their fiduciary responsibilities, and ultimately denied the American public—beneficiaries of the Smithson Trust—the opportunity to engage with and celebrate a critical chapter of American history. Their actions constitute a willful and repeated violation of their delegated powers as fiduciaries of a public trust.

## STANDING

Under the D.C. Trust Code and common trust law, where public officials fail to defend a charitable trust, courts have an affirmative duty to enforce compliance. See Kapiolani Park Preservation Society v. City and County of Honolulu, 751 P.2d 1022 (Haw. 1988) (granting standing to public beneficiaries to enforce charitable trusts).

Plaintiff invokes this authority in seeking redress, relief, and reform.

## PUBLIC INTEREST STATEMENT

The Smithsonian Institution exists for one reason alone: to serve the American people. This is not merely a moral ideal; it is a legally binding duty, as codified in the most fundamental principle of trust law:

**"A trustee shall administer the trust solely in the interests of the beneficiaries."**
*— Restatement (Third) of Trusts § 78(1)(a)*

The Smithsonian's own officials have long affirmed this fiduciary standard. In the wake of past scandals, the 2007 Independent Review Committee (IRC) stated unequivocally:

**"The paramount goal must be the restoration of public confidence. The Smithsonian belongs to the American people."**
*— IRC Report, 2007*

Smithsonian Secretary Lonnie Bunch echoed this sentiment, writing in *A Fool's Errand* (2019):

**"The Smithsonian is not an insider's club. We are accountable to the public — to the many, not the few."**

Yet under Bunch's own leadership, accountability was undermined. A judicial ruling in *Raven v. Sajet* found that Director Kim Sajet was "odious and partisan," yet the Institution allowed her to remain for

nearly a decade — dismissing public appeals, congressional warnings, and judicial admonishment.

Senator Chuck Grassley's oversight letters in 2007 and 2008 denounced this very pattern of behavior:

**"The Smithsonian culture has been plagued by secrecy, cronyism, and lack of accountability.**

**Congress cannot act as trustee in name only."**

— *Sen. Grassley, Letter to Chief Justice Roberts, April 2007*

In trust law, beneficiaries are not symbolic figures; they are the intended recipients of a sacred obligation. Julian Raven, as an American citizen and active participant in the cultural narrative the Institution was created to preserve, is among the millions entitled to that benefit. His exclusion, silencing, and targeting are not private slights — they are violations of a national trust.

And now, the stakes are higher than ever.

When the President of the United States publicly directed the removal of Kim Sajet in 2025, calling her "highly partisan" and unfit, it was not just a political moment — it was a public flashpoint for institutional scrutiny. The Smithsonian did not fire her. Instead, they protected her, resisted oversight, and rebuffed the very public they claim to serve. Sajet's eventual resignation is not vindication, but confirmation of the original breach. It reveals a system that only responds when exposed, never when appealed to in good faith.

Since his inauguration in January 2025, President Donald J. Trump has consistently drawn national attention to what he describes as the ideological corruption festering within the Smithsonian Institution. His repeated public comments and policy scrutiny have ignited widespread public concern about whether the Institution still honors its founding mission. This concern has crystallized in the case of *Raven v. Smithsonian*, where the ideological rot—long confined behind the Castle's walls—has now spilled into public view. Raven's research, lawsuits, and the resulting court rulings have substantiated the president's long-standing warnings, revealing that the will of James Smithson—the benefactor whose vision gave life to the Institution—has been distorted by entrenched ideologues posing as scholars. The courts now face a

historic obligation: first, to defend Smithson's original intent; second, to deliver justice to the citizen plaintiff who has endured years of litigation against an entity cloaked in institutional immunity; and finally, to heed the continuing scrutiny of the American People, expressed through their highest elected representative. The Smithsonian belongs to the People—not to bureaucrats—and the court must rule accordingly to restore that trust.

**"It is the peculiar province of equity, to compel the execution of trusts."**
— *United States v. Nobles, 30 U.S. 173, 188 (1831)*

This Court must now fulfill that peculiar province under the above U.S. Supreme Court mandate.

If not now — when a museum director is forced out by a sitting president for behavior long judicially documented — then when? If not here — in a trust created by an Englishman for the diffusion of knowledge in the New World — then where?

The garment has begun to unravel. The President pulled the first string. This Court must now follow through and unravel the rest.

---

## CONCLUSION

Throughout history, the American judiciary has intervened to protect the sanctity of trusts when fiduciaries faltered. The courts have consistently upheld that when trustees breach their duty, equity does not merely allow intervention — it demands it.

Let this be the moment when equity prevails.
Let this be the decision that restores a sacred American institution to its founding purpose.
Let this Court order what Congress has long refused: reform, restitution, and redemption.
For the benefit of the people. For the integrity of the Republic. For the honor of James Smithson's gift.

Because the Smithsonian belongs to the American people — not to insiders, not to ideologues, and certainly not to the odious and partisan.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

- Order a jury trial composed of American citizens, beneficiaries of the Will of James Smithson to establish the facts of this case to find the defendants liable.
- Upon that verdict, declare that Defendants both admitted to and have breached their fiduciary duties under federal law and trust doctrine;
- Remove named Defendants from any and all trust-related positions defaulting to U.S. Congress as principal Trustee to immediately take control of the institution.
- Compel formal acknowledgment and correction of curatorial abuses;
- Award compensatory and punitive damages where appropriate;
- Grant any other relief this Court deems just and proper.
- The court must order Congress to amend the Smithsonian Act of 1846 with the recommendations made in the 2007 IRC report regarding the reconstitution of the Smithsonian Board of Regents with consideration to the multiple failed Smithsonian reform bills that have been presented on the floor of the house over the last 25 years.
- Appoint independent, court-supervised fiduciaries to ensure institutional neutrality and compliance;

Dated: July 9, 2025
Respectfully submitted,
Julian Raven, Pro se
Plaintiff

## AFFIDAVIT

I, Julian Marcus Raven do hereby swear that a true and complete copy of this complaint has been served on each of the defendants at the Smithsonian Institution.

Julian Raven, pro se

714 Baldwin St.

Elmira, NY 14901

julianmarcusraven@gmail.com

434-221-1676

# ORDER

Accordingly, it is hereby:

**ORDERED**, that the United States Congress, as principal trustee of the Smithson Trust, is directed to:

1. **Immediately dissolve** the current **Board of Regents**, the Office of the **Secretary of the Smithsonian Institution**, and order the removal of **Dr. Richard Kurin** from all positions of trust and fiduciary oversight within the Smithsonian Institution; Also, after discovery uncovers and identifies the rest of the individuals involved in the Smithsonian rot, those too should be named and fired.
2. **Empower the House Committee on Administration** and the **Senate Rules and Administration Committee**, acting as the standing **Smithsonian Oversight Committees**, to assume temporary supervisory trusteeship of the Institution;
3. **Convene a nonpartisan working group** of experts in trust law, museum ethics, nonprofit governance, and constitutional law to reconstitute the Board of Regents and senior executive leadership of the Smithsonian;
4. **Develop and implement reforms** grounded in the existing foundational documents:
   - The **2007 Independent Review Committee (IRC) Report**;
   - Grassley, Norton and Sempolinski bills
5. **Ensure institutional realignment** with the original **will of James Smithson**, emphasizing the core trust mandate of the "**increase and diffusion of knowledge among men**" in every decision, collection, and public action;
6. **Establish a truth and reconciliation process** to formally review, redress, and where necessary, **restore** harmed individuals, artists, and communities marginalized or defrauded by past misconduct of the Institution;
7. **Issue biannual reports** to the Court and the American public on the progress of fiduciary restructuring and historical alignment;
8. **Preserve the Court's continuing jurisdiction** over this matter to monitor compliance, intervene if necessary, and ensure full enforcement of fiduciary restoration.
9. **All future meetings** of the reconstituted Board of Regents, curatorial panels, or administrative oversight bodies shall be **open to the public and subject to full transparency requirements**, including published minutes and live broadcasts, **as a precondition for the continued appropriation of federal taxpayer funds**;
10. The original **Smithson bequest**, which was diverted to government use in 1838 and borrowed under Congressional trusteeship, shall be **reinstated in full with 6% compound interest from the date of Congressional acceptance in 1846**, and restored to the Institution's private trust fund. This shall enable the Institution to operate in accordance with its original legal character as a **privately endowed charitable trust**, independent of improper political influence;
11. This Court does hereby issue a **Constitutional Declaration** that:
- The **American People are the legal and equitable beneficiaries** of the Smithson Trust;

- Because the Trust is overseen by the **United States Congress**, all **Constitutional protections apply in full** to interactions between Smithsonian agents and the public;
- No future trustee, officer, or agent—including museum directors such as Kim Sajet—shall violate the civil, constitutional, or expressive rights of any beneficiary under the guise of curatorial discretion or ideological bias.

12. The Court reserves the right to compel future removal of Smithsonian officials, declare void any unlawful policies, and enforce strict adherence to both trust and constitutional law **to prevent any future abuses** akin to those perpetrated and tolerated during Sajet's tenure.

SO ORDERED.

Dated: _____, 2025
Washington, D.C.

_____

**United States District Judge**